**CARUSO GLYNN, LLC**
Attorneys for Plaintiff
*Anna Maria Campo*
36 Peck Slip
New York, New York 10038
(718) 570-3338
File No.: 12.092613
Lawrence C. Glynn (LG-6431)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ANNA MARIA CAMPO,                                          Case No.:

                                    Plaintiff,

                                                          **VERIFIED**
          -against-                                       **COMPLAINT**

AUTO GALLERY IMPORTS INC.
and GM FINANCIAL,

                                    Defendants.
-----------------------------------------------------------x

Plaintiff, Anna Maria Campo (hereafter "Campo" or "Plaintiff"), by her attorneys **CARUSO GLYNN, LLC**, complaining of the Defendants, alleges upon information and belief that:

### Nature of Claim

1.       This is an action for actual damages, statutory damages, punitive damages, incidental and consequential damages, attorney's fees and the costs of this action against defendants AUTO GALLERY IMPORTS INC. ("AGI") and GM FINANCIAL ("GMF") pursuant to the Magnuson-Moss Warranty Act (the "MMWA"), 15 U.S.C. §2310, violations under §198-b of the New York General Business Law (the "Used Car Lemon Law"), Deceptive Trade Practices under New York General Business Law §349, fraud in the inducement, promissory estoppel and intentional infliction of emotional distress.

**The Parties**

2.      At all material times, plaintiff is an individual who resides in Rockland County in the State of New York.

3.      At all material times, AGI was and now is a New York corporation or other business entity doing business within the State of New York with a principal place of business at 500 Old Country Road, Westbury, NY 11590.

4.      At all material times, AGI was and now is a New York corporation or other business entity transacting business within the State of New York with a principal place of business at 500 Old Country Road, Westbury, NY 11590.

5.      At all material times, Sam Kaye ("Kaye") was and now is an individual who resides within the State of New York.

6.      At all material times, GMF is a financial institution with a principal place of business located at 801 Cherry Street, Suite 3500, Fort Worth, TX 76102.

**Jurisdiction**

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1337 and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. §1367.

**Facts**

8.      In late August, 2013, Plaintiff responded to an advertisement listed on www.autotrader.com for a used 2012 Porsche Panamera ("the vehicle") being sold by defendant AGI.

9.      The advertised price for the vehicle was $66,900.00.

2

10.     In late August 2013, Plaintiff met with defendant's salesman, Joseph Michelli ("Michelli") to look at, test drive and negotiate the price for the vehicle.

11.     Plaintiff was told by Michelli that she needed to leave a deposit of $200.00 to hold the vehicle.

12.     Plaintiff and Michelli negotiated the price of the vehicle to $61,900.00. A copy of Michelli's business card with the price and description of the vehicle on the back has been annexed hereto as Exhibit A.

13.     Plaintiff returned to AGI on September 2, 2013 to look at the car again with her mother and try to negotiate the price down further.

14.     Michelli was not at AGI on September 2, 2013 and Plaintiff met with a manager named Steve.

15.     On September 2, 2013, Steve told Plaintiff that the price of $61,900.00 was the lowest AGI could do for re-sale.

16.     On September 3, 2013, Plaintiff returned to AGI's location in Westbury, New York to complete the sale, execute necessary documents and take possession of the vehicle.

17.     On September 3, Plaintiff agreed to the price of $61,900.00 for the vehicle.

18.     At that time, Plaintiff made an additional down payment of $20,000.00 and AGI promised to arrange financing of the balance of the purchase price through a third-party lender.

19.     The Retail Installment Contract ("RISC") prepared by defendant and dated September 3, 2013 indicated a cash price of $75,073.00 which purportedly included sales tax in the amount of $6,071.96. A copy of the Retail Installment Contract has been annexed hereto as Exhibit B.

3

20.     Subtracting the purported sales tax amount of $6,071.96 from the purported cash price including sales tax of $75,073.00 yields a purported price of the vehicle, pre-tax, of $69,001.04.

21.     The sales tax rate for Rockland County where Plaintiff resides is 8.375%.

22.     Defendant charged sales tax in the amount of $6,071.96, which actually correlates to a purchase price of $72,501.01 ($6,071.96/.08375), not $69,001.04.

23.     Conversely, in order to arrive at a final price of $75,073.00 inclusive of sales tax, the purchase price would have to be $69,271.51.[1]

24.     Plaintiff inquired as to why the price had increased by $7,101.01 from the agreed upon price of $61,900.00 to the purported price of $69,001.04 not including taxes.

25.     Plaintiff was told by Sam Kaye ("Kaye") of AGI that the increase was for "the extended warranty, bank fees, registration, title, etc."

26.     The RISC lists charges of $322.00 for "Government License and/or Registration Fees" and $3,500.00 for a "Service Contract," totaling $3,822.00. Ex. B.

27.     Subtracting this amount from the $7,101.01 increase over the agreed upon price of $61,900.00 leaves $3,279.04 of unexplained charges.

28.     Plaintiff was never advised on September 3, 2013 that the increase in price was due to her credit score.

29.     Plaintiff was never advised on September 3, 2013 that she was being charged $3,279.04 to "buy points" to lower the rate.

---

[1] The equation is $1x + (.08375)(x) = \$75,073.00$, where x = the purchase price. Solving for x yields a purchase price of $69,271.51.

30.     Plaintiff trusted that what she was told about the increased cost was truthful and agreed to complete the transaction on September 3, 2013.

31.     Plaintiff was never provided with a copy of the bill of sale nor her credit application.

32.     Plaintiff took possession of the vehicle on September 3, 2013.

33.     Within the first week, Plaintiff noticed that the vehicle's fluid levels were low.

34.     Within the first week, Plaintiff noticed that the vehicle required an oil change.

35.     Within the first week, the vehicle's onboard computer indicated "CHANGE OIL NOW LEVEL REACHED TO A MINIMUM."

36.     Within the first week, Plaintiff noticed that the under body cover of the vehicle was ripped off.

37.     Within the first week, Plaintiff was driving on the FDR Drive and noticed that the under body cover of the vehicle was dragging along the highway.

38.     Within the first week, Plaintiff noticed that one of the tires was different and did not match the other three tires. When Plaintiff brought the car back to replace the worn, non-conforming tire, AGI replaced all four tires with used, worn tires from another one of its cars. As a result, the car has poor traction, veers while driving, especially on the Tapan Zee Bridge, and slips when making turns on wet roads.

39.     Prior to purchasing the vehicle, Plaintiff noticed water damage on the side molding. Plaintiff was told by Mr. Michelli that AGI would fix the stain and to just call the service department.

40.     Plaintiff returned the car on numerous occasions throughout September and October 2013 for AGI to make necessary repairs.

5

41.     Despite Mr. Michelli's promise, AGI refused to fix the water stain on the molding.

42.     As of October 3, 2013, AGI had still not fixed the damaged under-carriage and the vehicle remained unsafe to drive a month after Plaintiff purchased it.

43.     On September 24, 2013, Plaintiff returned the vehicle to AGI and informed Steve, the sales manager, that she wished to revoke her acceptance and asked for her down payment to be refunded.

44.     AGI refused to take back the vehicle and refund Plaintiff's money.

45.     Also on September 24, 2013, Plaintiff again asked the finance manager, Kaye, the reason for the increased cost from $61,900.00 to $69,001.04.

46.     Plaintiff was told at that time by Kaye that the increased cost for the vehicle represented, *inter alia*, an acquisition fee of $1,895.00, a dealer prep fee of $995.00 and bank fees of $595.00 for a total of $3,485.00.

47.     The RISC makes no mention of an acquisition fee, a dealer prep fee or bank fees.

48.     Kaye also told Plaintiff on September 24, 2013 at approximately 2:30 p.m., that the remainder of the increase in price was due to Plaintiff's low credit score.

49.     At the time and place aforesaid, Kaye told Plaintiff that he had to "buy points" to bring the interest rate down to 9.75%.

50.     At the time and place aforesaid, Kaye told Plaintiff that the cost to "buy points" to get the rate down to 9.75% was $4,000.00.

51.     Given the lack of transparency in the RISC, the significant increase in price from the agreed upon price of $61,900.00 and the shifting explanations for the increase, plaintiff believed that she had been the victim of fraud.

6

52.    Plaintiff contacted defendant GMF to inquire about the terms of her loan.

53.    Plaintiff specifically inquired as to whether it was necessary for AGI to "buy points" at a cost of $4,000.00 in order to get Plaintiff's rate down to 9.75%.

54.    Plaintiff was informed by GMF that no such fee was charged for the 9.75% and that 9.75% was the approved rate given her credit score and financial history.

55.    On October 14, 2013, Plaintiff's counsel sent a certified letter to AGI advising that Plaintiff was revoking acceptance of the vehicle and demanding a full refund of Plaintiff's down payment.

56.    On October 28, 2013, Sam Kaye of AGI called Plaintiff and told her that he wanted to "go over the numbers with her."

57.    Plaintiff replied that she simply wanted her money back and that she did not want the car due to its many defects.

58.    Shortly thereafter, on October 28, 2013, AGI's service manager, Henry Mendez called and said that he needed Plaintiff to bring the vehicle in so that he could measure for new tires and that he didn't want to order the wrong ones and be stuck with expensive tires.

59.    Plaintiff agreed and brought the vehicle back to AGI on October 28, 2013.

60.    When she arrived at AGI on October 28, 2013, Plaintiff was not met by Henry Mendez but was instead confronted by Kaye who pleaded with her not to proceed with litigation.

61.    Kaye pleaded with Plaintiff to go over the numbers again with him.

62.    Plaintiff told Kaye that she knew there was never any "buy down" of points and that AGI defrauded her of her money.

7

63.     Kaye continued to plead for Plaintiff to give him five minutes to go over the numbers and if a refund of a portion of the purchase price was due, AGI would pay it.

64.     Plaintiff informed Kaye for the third time that she was revoking acceptance of the car and demanded a full refund of her down payment plus her first month payment to GMF and the cost of an alignment that she was required to have done, due to the vehicle being delivered to her from AGI out of alignment.

65.     Kaye refused to take the vehicle back and refund Plaintiff's money.

66.     Kaye then became extremely aggressive, violent and angry.

67.     Fearful of Kaye's aggressive, violent and angered state, Plaintiff left the AGI building.

68.     A visibly enraged Kaye proceeded to follow Plaintiff outside where he accosted and verbally threatened her not to file a law suit.

69.     As a result of Kaye's aggressive, violent, and abusive actions, Plaintiff was extremely nervous, distraught and very fearful for her safety.

### First Cause of Action
### Fraud in the Inducement

70.     On or about September 3, 2013, AGI misrepresented a material fact to Plaintiff, *to wit*, the true cost of the vehicle including all fees associated with the purchase of the vehicle.

71.     On or about September 3, 2013, AGI, misrepresented a material fact to Plaintiff, *to wit*, the reason for an additional charge of $3,279.04.

72.     This misrepresentation of a material fact was made orally by AGI's manager, Steve, who when asked about the increase stated on September 3, 2013 that the additional charges were for "the extended warranty, bank fees, registration, title, etc."

73.     Thereafter, on September 24, 2013, AGI's finance manager, Sam Kaye, represented to Plaintiff that an additional charge of $4,000.00 was necessary to "buy points" to lower Plaintiff's rate.

74.     This statement by Sam Kaye was made to Plaintiff at approximately 2:30 p.m. while Plaintiff was physically at the AGI dealership located at 500 Old Country Road, Westbury, New York, and Sam Kaye was reached by other AGI employees via cell phone to explain to Plaintiff the nature of this charge.

75.     This representation by Sam Kaye, i.e., that Plaintiff had to pay AGI $4,000.00 in additional funds in order to "buy points" to lower her loan rate, was soon found to be false.

76.     So too was the original statement made by Steve on September 3, 2013, that the additional charge was for "the extended warranty, bank fees, registration, title, etc.," as the extended warranty is listed on the RISC as $3,500.00, registration and title is listed as $322.00, and there was no "bank fees" listed anywhere therein.

77.     The additional $3,279.04 was nothing more than AGI lining its pockets upon the false pretense that it was for "bank fees" or to "buy points."

78.     Defendants knew at the time these statements were made that charging a customer an amount of $3,279.04 under the pretense that it was for "bank fees" or to "buy points" to lower the loan rate, is unethical and in bad faith.

79.     Defendants knew at the time these statements were made that charging a customer an amount of $3,279.04 under the pretense that it was for "bank fees" or to "buy points" to lower the loan rate, is a criminal act of theft.

9

80.     Defendants deceived Plaintiff into paying this additional $3,279.04 by lying to her that this amount was necessary for some undisclosed "bank fee" or to "buy points" in order to reduce the rate of her loan.

81.     The oral promises made by AGI to Plaintiff, *to wit*, that the additional $3,279.04 was for "bank fees" or to "buy points" were collateral to the terms of the sale of the vehicle.

82.     As a result of the foregoing, Plaintiff has sustained actual damages as nearly as can be determined in the amount of $3,279.04.

83.     In addition, as a result of AGI's wanton dishonesty and criminality directed at Plaintiff and, upon information and belief, the general public, Plaintiff demands punitive damages be awarded in an amount to be determined at the trial of this action.

## Second Cause of Action
## Promissory Estoppel

84.     Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "83" with the same force and effect as though more fully set forth herein at length.

85.     On or about September 3, 2013, AGI promised to Plaintiff that the true cost of the vehicle included a $3,279.04 charge for "bank fees," when in reality AGI unilaterally renegotiated the purchase price of the car and proceeded to line its pockets under false pretense.

86.     On or about September 24, 2013, AGI promised to Plaintiff that the true cost of the vehicle included a $4,000.00 charge to "buy points" in order to get Plaintiff's loan rate down to 9.75%.

87.     Plaintiff reasonably and foreseeably relied upon the September 3, 2013 promise in making her decision to purchase the vehicle.

88.     But for this assurance by AGI on September 3, 2013 that the additional $3,279.04 was for "bank fees" as opposed to AGI syphoning more money from Plaintiff, Plaintiff would not have purchased the vehicle.

89.     Plaintiff has since learned that there was no need for this $3,279.04 "bank fee" nor was there any need for a $4,000.00 charge to "buy points" and that, in fact, GMF had already approved Plaintiff for a loan at the rate of 9.75%.

90.     As a result of Plaintiff's reasonable and foreseeable reliance upon the promises made by AGI as to the nature of the $3,279.04 fee applied to the purchase price of the vehicle, Plaintiff has sustained actual damages as nearly as can be determined in the amount of $3,279.04.

### Third Cause of Action
### Deceptive Trade Practices under New York G.B.L. §349

91.     Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "90" with the same force and effect as though more fully set forth herein at length.

92.     Defendant committed deceptive acts or practices in the conduct of its business of selling used cars.

93.     Specifically, Defendant deceived Plaintiff and others with lower credit into paying additional fees described as "bank fees" or to "buy points" which were never disclosed in the RISC or bill of sale.

94.     In reality, there was no "bank fee" and no such payment was ever made by AGI to the third-party lender, GMF to buy points, nor was such payment ever demanded or required from GMF.

95.     AGI's deception, *to wit*, exacting additional monies from Plaintiff under the pretense of "bank fees" or to lower Plaintiff's finance charges, was targeted at not only Plaintiff but, upon information and belief, other purchasers with distressed or below average credit.

96.     General Business Law §349 prohibits the use of deceptive or unfair practices in connection with the sale of an automobile to a consumer.

97.     The various misrepresentations and improper disclosure set forth above were materially misleading and Plaintiff has suffered actual injury as a result.

98.     As a result of AGI's deceptive trade practices, Plaintiff has sustained actual damages as nearly as can be determined in the amount of $3,279.04.

99.     In addition, as a result of AGI's deceptive trade practices, Plaintiff is paying considerably more for the vehicle than agreed upon and paying interest charges in excess of the interest charges she would have been paying had it not been for the Defendant's conduct.

100.    Thus, Plaintiff has been and continues to be damaged as a result of Defendant's deceptive and misleading practices.

101.    Plaintiff is entitled to damages and attorney's fees as a result of Defendant's violation of §349.

102.    Plaintiff hereby demands that all attorney's fees, costs and other fees of this action be borne by Defendant and that the Court award Plaintiff punitive damages in an amount to be determined at trial.

**Fourth Cause of Action**
**Deceptive Trade Practices under New York G.B.L. §349 - Part II**

103.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "102" with the same force and effect as though more fully set forth herein at length.

104.    Defendant committed deceptive acts or practices in the conduct of its business of selling used cars.

105.    Specifically, Defendant deceived Plaintiff and others into purchasing an extended warranty promising to cover the vehicle for all repairs for 100,000 miles, including any major repairs.

106.    Defendant charged Plaintiff $3,500.00 for a "service contract" which was explained to Plaintiff as the aforementioned extended warranty.

107.    In reality, the warranty provided was only for 36,000 miles or 36 months, whichever came first.

108.    AGI's deception, *to wit*, exacting additional monies from Plaintiff under the pretense of a 100,000 mile extended warranty and couching it as a "service contract", was targeted at not only Plaintiff but, upon information and belief, other purchasers of AGI's used vehicles.

109.    General Business Law §349 prohibits the use of deceptive or unfair practices in connection with the sale of an automobile to a consumer.

110.    The various misrepresentations and improper disclosure set forth above were materially misleading and Plaintiff has suffered actual injury as a result.

111.    As a result of AGI's deceptive trade practices, Plaintiff has sustained actual damages as nearly as can be determined in the amount of $3,500.00.

13

112. In addition, as a result of AGI's deceptive trade practices, Plaintiff is paying considerably more for the vehicle than agreed upon and paying interest charges in excess of the interest charges she would have been paying had it not been for the Defendant's conduct.

113. Thus, Plaintiff has been and continues to be damaged as a result of Defendant's deceptive and misleading practices.

114. Plaintiff is entitled to damages and attorney's fees as a result of Defendant's violation of §349.

115. Plaintiff hereby demands that all attorney's fees, costs and other fees of this action be borne by Defendant and that the Court award Plaintiff punitive damages in an amount to be determined at trial.

<b>Fifth Cause of Action<br>Breach of Express Warranty<br>Pursuant to the Magnuson-Moss Warranty Act</b>

116. Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "115" with the same force and effect as though more fully set forth herein at length.

117. On or about September 3, 2013, Plaintiff took possession of the vehicle and shortly thereafter experienced numerous defects which substantially impacted the use, value and/or safety of the vehicle.

118. Plaintiff avers that as a result of the ineffective repair attempts made by AGI, the vehicle cannot be utilized for personal, family and household use as intended by Plaintiff at the time of acquisition.

119. The specific non-conformities which have not been corrected by AGI relate to the under-body cover which is hanging and drags along the road, used/worn tires and improper alignment.

120. Plaintiff has provided Defendant sufficient opportunity to repair and/or replace the defective components in the vehicle.

121. Despite a reasonable number of attempts by Plaintiff to have Defendant cure the defects, Defendant AGI has refused to repair and/or replace the defective components described herein.

122. Plaintiff has justifiably lost confidence in the vehicle's safety and reliability, and said non-conformities have substantially impaired the value of the vehicle.

123. Said non-conformities could not reasonably have been discovered by Plaintiff prior to Plaintiff's acceptance of the vehicle.

124. Plaintiff contacted the Defendant on numerous occasions about the non-conformities and stated to Defendant that she was revoking acceptance of the vehicle.

125. On September 24, 2013, Plaintiff returned the vehicle to AGI and stated that she wanted her down payment refunded.

126. At the time of revocation on September 24, 2013, the vehicle was in substantially the same condition as at delivery.

127. Defendant has refused Plaintiff's revocation of acceptance, and has refused to provide Plaintiff with the remedies to which Plaintiff is entitled upon revocation.

128. The vehicle remains in a defective and unmerchantable condition, and continues to exhibit the above mentioned defects which substantially impair its use, value and/or safety.

129.    Plaintiff paid $3,500 for an extended warranty which she was told by AGI covered all repairs to the vehicle for 100,000 miles.

130.    Plaintiff later learned that the warranty was only for 36,000 miles or 36 months, whichever comes first.

131.    Upon contacting the company set forth on the warranty application, Plaintiff further learned that there was no record of any such warranty having been purchased.

132.    New York General Business Law §198-b requires AGI to provide Plaintiff with a 90 day or 4,000 mile (whichever comes first) warranty.

133.    As such, the defects Plaintiff complains of arose during the aforementioned warranty periods and Defendant was timely informed of said defects.

134.    The defects are "covered parts" as defined in §198-b of the New York General Business Law.

135.    The Defendant failed to honor the terms of said warranty by refusing to correct said defects and as a result of Defendant's failure to honor the warranty, Plaintiff cannot utilize the vehicle.

136.    Plaintiff has been and will continue to be financially damaged due to Defendant's intentional, reckless, wanton and negligent failure to comply with the provisions of its warranty.

137.    Plaintiff is entitled to a full refund from Defendant of the purchase price including all finance charges as well as reasonable attorney's fees.

## Sixth Cause of Action
## Breach of General Business Law §198-b
## (Used Car "Lemon Law")

138.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "137" with the same force and effect as though more fully set forth herein at length.

139.    Defendant failed to repair the defects within a reasonable period of time or within a reasonable number of attempts.

## Seventh Cause of Action
## Breach of Implied Warranty
## Pursuant to the Magnuson-Moss Warranty Act

140.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "139" with the same force and effect as though more fully set forth herein at length.

141.    Plaintiff's vehicle was subject to an implied warranty of merchantability as defined in 15 U.S.C. §2301(7) running from the Defendant to the intended consumer, Plaintiff herein.

142.    Defendant is a supplier of consumer goods as a person engaged in the business of making a consumer product directly available to Plaintiff.

143.    Defendant is prohibited from disclaiming or modifying any implied warranty when making a written warranty to the consumer or when Defendant has entered into a contract in writing to perform services relating to the maintenance or repair of a motor vehicle within ninety (90) days of a sale.

144.    Pursuant to 15 U.S.C. §2308, Plaintiff's vehicle was impliedly warranted to be substantially free of defects and non-conformities in both material and workmanship, and thereby fit for the ordinary purpose for which it was intended.

145.    The vehicle was warranted to pass without objection in the trade under the contract description, and was required to conform to the descriptions of it contained in the contracts and labels.

146.    The above described defects and non-conformities present in the vehicle render it unmerchantable, unsafe, and thereby not fit for the ordinary and essential purpose for which it was intended as represented by Defendant.

147.    As a result of the breaches of implied warranty by Defendant, Plaintiff is without the reasonable value of the vehicle.

148.    As a result of the breaches of implied warranty by Defendant, Plaintiff has suffered and will continue to suffer various damages.

149.    If Plaintiff prevails, she is also entitled to an award of reasonable attorney's fees, costs and interest under 15 U.S.C. §3210(d)(2).

## Eighth Cause of Action
### Revocation of Acceptance Pursuant to §2310(d)
### of the Magnuson-Moss Warranty Act

150.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "149" with the same force and effect as though more fully set forth herein at length.

151.    The defects and non-conformities present in the vehicle substantially impaired the value of the vehicle to Plaintiff.

18

152.    After providing more than a reasonable number of attempts to repair the defects and non-conformities, Plaintiff notified Defendant that she was revoking her acceptance of the vehicle.

153.    Plaintiff may seek the remedy of revocation of acceptance under 15 U.S.C. §2310(d) and based upon such revocation, Plaintiff is entitled to the return of the purchase price in exchange for the return of the vehicle, plus attorney's fees, costs and interest.

### Ninth Cause of Action
### Liability of GM Financial

154.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "153" with the same force and effect as though more fully set forth herein at length.

155.    Federal Law (16 C.F.R. part 433) requires that all consumer installment contracts contain the following provision:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF, RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

156.    GMF is the holder of the RISC for the purchase of Plaintiff's vehicle. It is bound by the terms quoted in Paragraph 154 above, subjecting it to all claims and defenses which Plaintiff has asserted against the Defendant.

157.    Plaintiff used the funds provided under the RISC in order to obtain the vehicle.

158.    GMF has entered into a master loan agreement with AGI whereby AGI submits various documents, including a credit application, to GMF for approval of various consumer loans.

19

The documents submitted to GMF upon which the approval of such loans are contingent are referred to as a "loan package."

159.   Once GMF approves the terms of a loan, it has agreed, pursuant to the master loan agreement, to take assignment of a retail installment contract, subject to other documents being properly executed and delivered to GMF.

160.   In the instant matter, GMF reviewed the loan package for the Plaintiff's loan and made its determination to accept the assignment of the RISC based on the documents contained in the loan package.

161.   GMF is liable to the Plaintiff under the First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth Causes of Action since GMF is subject to all claims and defenses that Plaintiff has against AGI under 16 C.F.R. part 433 and the specific language contained in the RISC.

### Tenth Cause of Action
### Intentional Infliction of Emotional Distress as Against Sam Kaye

162.   Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "161" with the same force and effect as though more fully set forth herein at length.

163.   On October 28, 2013, Plaintiff was lured back to AGI under the pretext that AGI's service manager, Henry Mendez, would measure the vehicle for new tires, to replace the used, worn and unsafe tires originally provided.

164.   Upon entering the AGI building, Plaintiff was instead met by Kaye.

165.   Kaye pleaded with Plaintiff to "go over the numbers again" with him.

166.   Plaintiff told Kaye that she knows there was never any "buy down" of points and that AGI defrauded her of her money.

167. Kaye continued to plead for Plaintiff to give him five minutes to go over the numbers and if a refund of a portion of the purchase price was due, AGI would pay it.

168. Plaintiff informed Kaye for the third time that she was revoking acceptance of the car and demanded a refund.

169. Kaye refused to take the vehicle back and refund Plaintiff's money.

170. Kaye then became extremely aggressive, violent and angry.

171. Fearful of Kaye's aggressive, violent and angered state, Plaintiff left the AGI building.

172. A visibly enraged Kaye then followed Plaintiff outside where he accosted and verbally threatened her not to file a law suit.

173. As a result of Kaye's aggressive, violent, and abusive actions, Plaintiff was extremely nervous, distraught and very fearful for her safety.

174. Plaintiff became extremely frightened and victimized.

175. Kaye's threats, bullying, intimidation, anger and violent nature was purposeful and intended to silence and intimidate Plaintiff from filing a lawsuit.

176. As a result of this Kaye's aggression, bullying, violence and/or anger, Plaintiff genuinely perceived that she was in imminent danger.

177. Kaye's actions on October 28, 2013 were extreme, outrageous, atrocious, uncivilized and intolerable.

178. Furthermore, the course of conduct on the part of Kaye and his scheme to defraud Plaintiff, taken in its totality, demonstrates conduct which is extreme, outrageous, atrocious, uncivilized and intolerable.

178.   Kaye undertook these actions to emotionally hurt Plaintiff.

179.   Kaye undertook these actions to intimidate Plaintiff.

180.   Kaye knowingly, willfully and/or recklessly disregarded the substantial probability that his actions would cause Plaintiff severe emotional distress.

181.   Plaintiff felt traumatized, violated, frightened, depressed and distraught as a result of Kaye's willful and malicious threatening behavior and intimidation.

182.   Plaintiff has and will continue to suffer from symptoms of post traumatic stress and other physical, mental and emotional injuries as a result of Kaye's actions aforesaid.

183.   As a result of the foregoing, Plaintiff has sustained damages as nearly as same can now be estimated in the amount of Two Million Dollars ($2,000,000.00).

### Eleventh Cause of Action
### Intentional Infliction of Emotional Distress as Against AGI

184.   Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "183" with the same force and effect as though more fully set forth herein at length.

185.   At all times relevant, Kaye was acting within the scope of his employment at AGI.

186.   An act is considered to be within the scope of employment if it is performed while the employee is engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or incidental to such employment (*see Oliva v. City of New York*, 297 A.D.2d 789, 748 N.Y.S.2d 164 (2d Dept. 2002); *Smith v. Midwood Realty Assoc.*, 289 A.D.2d 391, 734 N.Y.S.2d 237 (2d Dept. 2001); *Felberbaum v. Weinberger*, 54 AD3d 717 (2d Dept. 2008).

187.   An employer is vicariously liable for the torts of its employee, even when the employee's actions are intentional, if the actions were done while the employee was acting within

22

the scope of his employment. *Riviello v. Waldron*, 47 N.Y.2d 297 (1979); *Brancato v. Dee & Dee Purchasing*, 296 A.D.2d 518 (2d Dept. 2002).

188.   As a result of Kaye's aggressive, bullying, violent, and abusive actions, Plaintiff was extremely nervous, distraught and very fearful for her safety.

189.   Plaintiff became extremely frightened and victimized.

190.   Kaye's threats, threatening tone, intimidation, anger and violent nature was purposeful and intended to silence and intimidate Plaintiff from filing a lawsuit against his employer, AGI.

191.   As a result of this Kaye's aggression, bullying, violence and/or anger, Plaintiff genuinely perceived that she was in imminent danger of bodily harm.

192.   Kaye's actions were extreme, outrageous, atrocious, uncivilized and intolerable.

193.   Kaye undertook these actions to emotionally hurt Plaintiff.

194.   Kaye undertook these actions to intimidate Plaintiff and prevent her from filing a legitimate lawsuit against his employer, AGI.

195.   Furthermore, the course of conduct on the part of AGI to defraud Plaintiff, taken in its totality, demonstrates conduct which is extreme, outrageous, atrocious, uncivilized and intolerable.

196.   AGI knowingly, willfully and/or recklessly disregarded the substantial probability that its actions would cause Plaintiff severe emotional distress.

197.   Plaintiff felt traumatized, violated, frightened, depressed and distraught as a result of Kaye's willful and malicious threats, aggression and violent behavior.

198.    Plaintiff has and will continue to suffer from symptoms of post traumatic stress and other physical, mental and emotional injuries as a result of AGI's actions aforesaid.

199.    As a result of the foregoing, Plaintiff has sustained damages as nearly as same can now be estimated in the amount of Two Million Dollars ($2,000,000.00).

WHEREFORE, Plaintiffs demand judgment against Defendants AGI, Kaye and GMF as follows:

a)    On the First Cause of Action for Fraud in the Inducement, actual and punitive damages as well as an award of reasonable attorney's fees, costs and expenses;

b)    On the Second Cause of Action for Promissory Estoppel, actual damages as well as an award of reasonable attorney's fees, costs and expenses;

c)    On the Third Cause of Action for Deceptive Trade Practice under New York General Business Law §349 for damages in an amount to be determined at trial, including incidental and consequential damages, as well as an award of reasonable attorney's fees, costs and expenses;

d)    On the Fourth Cause of Action for Deceptive Trade Practice under New York General Business Law §349 for damages in an amount to be determined at trial, including incidental and consequential damages, as well as an award of reasonable attorney's fees, costs and expenses;

e)      On the Fifth Cause of Action for Breach of Express Warranty under the Magnuson-Moss Warranty Act for damages in an amount to be determined at trial, including incidental and consequential damages, as well as an award of reasonable attorney's fees, costs and expenses;

f)      On the Sixth Cause of Action for Breach of New York General Business Law §198-b ("Used Car Lemon Law"), a refund of the purchase price, incidental and consequential damages, as well as an award of reasonable attorney's fees, costs and expenses;

g)      On the Seventh Cause of Action for Breach of Implied Warranty under the Magnuson-Moss Warranty Act for damages in an amount to be determined at trial, including incidental and consequential damages, as well as an award of reasonable attorney's fees, costs and expenses;

h)      On the Eighth Cause of Action for Revocation of Acceptance Pursuant to §2310(d) of the Magnuson-Moss Warranty Act, a refund of the purchase price, incidental and consequential damages, as well as an award of reasonable attorney's fees, costs and expenses;

i)      On the Ninth Cause of Action, as set forth above in the paragraphs (a) through (h);

j)      On the Tenth Cause of Action against Kaye for Intentional Infliction of Emotional Distress, judgment for the amount of $2,000,000.00;

k)      On the Eleventh Cause of Action against AGI for Intentional Infliction of Emotional Distress, judgment for the amount of $2,000,000.00;

l)      Punitive damages, and

m)    That this Court will grant to Plaintiff such other and further relief as may be just and

proper, including an award of attorney's fees, prejudgment interest and costs.

Dated: New York, New York
       November 5, 2013

                         Yours, etc.,

                         **CARUSO GLYNN, LLC**
                         Attorneys for Plaintiff
                         *Anna Maria Campo*

                         By:_____ /s/ *Lawrence C. Glynn* _____

                         Lawrence C. Glynn
                         36 Peck Slip
                         New York, New York 10038
                         (718) 570-3338
                         File No.:  12.092613.01

**EXHIBIT A**



$61900
2012. Porshe
PAN. 4S
10K

**EXHIBIT B**

**RETAIL INSTALMENT CONTRACT**
**SIMPLE FINANCE CHARGE**

| Dealer Number | Contract Number |
|---|---|

| Buyer (and Co-Buyer) Name and Address (Including County and Zip Code) | Creditor - Seller (Name and Address) |
|---|---|
| ANNAMARIA R CAMPO<br><br>12 ARON CT<br><br>SPRING VALLEY NY 10977 | Auto Gallery Imports<br>500 Old Country Rd<br>Westbury, NY 11590 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2012 | PORSCHE PANAMERA | WP0AA2A70CL912538 | ☒ personal, family or household<br>☐ business<br>☐ agricultural ☐ |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $20,200.00 is |
|---|---|---|---|---|
| 9.75 % | $ 19,064.28 | $ 58,695.00 | $77,759.28 | $ 97,959.28 |

### Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | 1,079.99 | Monthly beginning 10/03/2013 |

Or As Follows:

**Late Charge.** If payment is not received in full within __10__ days after it is due, you will pay a late charge of $ __1.00__ or __5__ % of the part of the payment that is late whichever is __greater__.

**Prepayment.** If you pay off all your debt early, you will not have to pay a penalty.

**Security Interest.** You are giving a security interest in the vehicle being purchased.

**Additional Information:** See the contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1 Cash Price (including $ __6,071.96__ sales tax) | $ 75,073.00 | (1) |
| 2 Total Downpayment = | | |

Trade-In _____
       (Year)    (Make)    (Model)

| | | |
|---|---|---|
| Gross Trade-In Allowance | $ N/A | |
| Less Pay Off Made By Seller | $ N/A | |
| Equals Net Trade In | $ 0.00 | |
| + Cash | $ 20,200.00 | |
| + Other | $ N/A | |
| (If total downpayment is negative, enter "0" and see 4I below) | $ 20,200.00 | (2) |
| 3 Unpaid Balance of Cash Price (1 minus 2) | $ 54,873.00 | (3) |

4 Other Charges Including Amounts Paid to Others on Your Behalf
(Seller may keep part of these amounts):

| | | |
|---|---|---|
| A Cost of Optional Credit Insurance | | |
| Paid to Insurance Company or Companies. | | |
| Life | $ N/A | |
| Disability | $ N/A | $ N/A |
| B Vendor's Single Interest Insurance | | |
| Paid to Insurance Company | $ 0.00 | |
| C Other Insurance Paid to the Insurance Company | $ N/A | |
| D Fees Paid to Government Agencies | | |
| to _____ for _____ | $ N/A | |
| to _____ for _____ | $ N/A | |
| to _____ for _____ | $ N/A | |
| E Government Taxes Not Included in Cash Price | $ N/A | |
| F Government License and/or Registration Fees | | |
| | $ 322.00 | |
| G Government Certificate of Title Fees | $ 0.00 | |
| H Government Waste Tire Management Fee | $ 0.00 | |
| I Other Charges (Seller must identify who is paid and describe purpose) | | |
| to _____ for Prior Credit or Lease Balance | $ N/A | |
| to Auto Gallery Impor for _____ | $ 0.00 | |
| to GWC for SERVICE CONTRACT | $ 3,500.00 | |
| to _____ for GAP INSURANCE | $ 0.00 | |
| to _____ for _____ | $ N/A | |
| to _____ for _____ | $ N/A | |
| Total Other Charges and Amounts Paid to Others on Your Behalf | $ 3,822.00 | (4) |
| 5 Amount Financed (3 + 4) | $ 58,695.00 | (5) |

**Insurance.** You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below:

### Optional Credit Insurance

☐ Credit Life   ☐ Buyer   ☐ Co-Buyer   ☐ Both
☐ Credit Disability (Buyer Only)

Premium:
   Credit Life $ _____ N/A
   Credit Disability $ _____ N/A

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

### Other Insurance

☐
Type of Insurance _____ Term

Premium $ _____ N/A

Insurance Company Name _____

Home Office Address _____ N/A

I want the insurance checked above.

X _____
Buyer Signature          Date

X _____
Co-Buyer Signature       Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE.**

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose the insurance company through which the VSI insurance is obtained. If you elect to purchase VSI insurance through the Creditor, the cost of this insurance is $ _____ and is also shown in Item 4B of the ITEMIZATION OF AMOUNT FINANCED. The coverage is for the initial term of the contract.

**Returned Check Charge:** You agree to pay a charge of $ __20__ if any check you give us is dishonored.

| | | | | | Insurance Company Name | |
|---|---|---|---|---|---|---|
| B | Gross Single Interest Insurance | | | N/A | | |
| | Paid to Insurance Company | $ | 0.00 | | Home Office Address ___ N/A | |
| C | Other Insurance Paid to the Insurance Company | $ | N/A | | |
| D | Fees Paid to Government Agencies | | | | I want the insurance checked above. |
| | to ___ for ___ | $ | N/A | | |
| | to ___ for ___ | $ | N/A | | X ___ |
| | to ___ for ___ | $ | N/A | | Buyer Signature      Date |
| E | Government Taxes Not Included in Cash Price | $ | N/A | | |
| F | Government License and/or Registration Fees | | | | X ___ |
| | ___ | $ | 322.00 | | Co-Buyer Signature    Date |

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE.**

| | | | | |
|---|---|---|---|---|
| G | Government Certificate of Title Fees | $ | 0.00 |
| H | Government Waste Tire Management Fee | $ | 0.00 |
| I | Other Charges (Seller must identify who is paid and describe purpose) | | |
| | to ___ for Prior Credit or Lease Balance | $ | N/A |
| | to Auto Gallery Import for ___ | $ | 0.00 |
| | to GMAC for SERVICE CONTRACT | $ | 3,500.00 |
| | to ___ for GAP INSURANCE | $ | 0.00 |
| | to ___ for ___ | $ | N/A |
| | to ___ for ___ | $ | N/A |
| | Total Other Charges and Amounts Paid to Others on Your Behalf | $ | 3,822.00 (4) |
| 5 | Amount Financed (3 + 4) | $ | 58,695.00 (5) |

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose the insurance company through which the VSI insurance is obtained. If you elect to purchase VSI insurance through the Creditor, the cost of this insurance is $ ___ and is also shown in item 4B of the ITEMIZATION OF AMOUNT FINANCED. The coverage is for the initial term of the contract.

**Returned Check Charge:** You agree to pay a charge of $ __20__ if any check you give us is dishonored.

---

**OPTION:** ☐ You pay no finance charge if the amount financed, item 5, is paid in full on or before ___ . Year ___ . SELLERS INITIALS ___ .

**NO COOLING OFF PERIOD**

**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.    Buyer Signs X ___ Co-Buyer Signs X ___

If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

**See back for other important agreements.**

**NOTICE TO BUYER: 1. Do not sign this agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of the agreement. 3. Under the law, you have a right to pay off in advance the full amount due. If you do so, you may, depending on the nature of the credit service charge, either (a) prepay without penalty, or (b) under certain circumstances obtain a rebate of the credit service charge. 4. According to law, you have the privilege of purchasing the insurance on the motor vehicle provided for in this contract from an agent or broker of your own selection.**

**You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.**

**RETAIL INSTALMENT CONTRACT**

Buyer Signs X ___ Date 9/3/2013   Co-Buyer Signs X ___ Date ___

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X ___   Address ___
Seller signs ___ Date 9/3/2013 By X ___ Title ___

| | | |
|---|---|---|
| Seller assigns its interest in this contract to | | (Assignee) under the terms of Seller's agreement(s) with Assignee. |
| ☐ Assigned with recourse | ☒ Assigned without recourse | ☐ Assigned with limited recourse |
| Seller   Auto Gallery Imports | By | Title   GM |

**LAW** FORM NO. 553-NY (REV. 8/05)  U.S. PATENT NO. D460,782
©2005 Reynolds and Reynolds  TO ORDER: www.reysource.com; 1-800-344-0996; fax 1-800-531-9055.
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

CUSTOMER/BUYER INCLUDING COPY

**OTHER IMPORTANT AGREEMENTS**

## 1. FINANCE CHARGE AND PAYMENTS

a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

## 2. YOUR OTHER PROMISES TO US

a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

c. **Security interest.**
You give us a security interest in:
- The vehicle and all parts or goods installed in it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

d. **Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, we may subtract the refund from what you owe.

## 3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES

if you pay late, we may also take the steps described below.

b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract or may be subject to any right you have to reinstate the contract or cure (see below). Default means:
- You do not pay any payment on time.
- You start a proceeding in bankruptcy or one is started against you or your property; or
- You break any agreements in this contract.

The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Prepaid Finance Charge and the Finance Charge, any late charges, and any amounts due because you defaulted.

c. **You may have to pay collection costs.** If we hire an attorney who is not our salaried employee to collect what you owe, you will pay the attorney's fee and court costs as permitted by law. The maximum attorney's fee you will pay will be 15% of the amount you owe.

d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you. If we do, so peacefully and the law allows it, If any vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem) two things are true. You have the right to get the vehicle back by paying all past due payments, the late charges, and any expenses we incurred related to repossessing the vehicle, holding it, and preparing it for sale or resale. Also, you must have bought the vehicle primarily for personal, family, or household use. Second, your only default is a failure to pay an installment payment on time. Otherwise we will tell you how much to pay to get the vehicle back. Your right to get the vehicle back ends when we sell it.

f. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle. We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left over, we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us if you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or repossess the vehicle, we may claim benefits under these contracts and cancel them to get refunds of unearned charges to reduce what you owe or repair the vehicle. If you default, you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle.

## 4. WARRANTIES SELLER DISCLAIMS

Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide. If the Seller has sold you a certified used vehicle, this disclaimer does not affect any warranties given in connection with the certification.

## 5.
Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any

**c. Security Interest.**

You give us a security interest in:
- The vehicle and all parts or goods installed in it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

**d. Insurance you must have on the vehicle.**

You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e. What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, we may subtract the refund from what you owe.

---

**3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

**a. You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

**f.** **We will sell the vehicle if you** do not get it back if you do not redeem. We will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate, until you pay.

**g. What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

**4. WARRANTIES SELLER DISCLAIMS**

Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide or limit any rights you may have under the Lemon Laws.

**5. Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.**

**Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

**6. Applicable Law**

Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

---

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-NY 8/05

## ATTORNEY'S VERIFICATION

Lawrence C. Glynn, under the penalties of perjury, hereby affirms that I am a member of the law firm of **CARUSO GLYNN, LLC**, that I have read the foregoing Complaint and know the contents thereof, and that the same is true to my own knowledge except as to matters therein stated to be alleged on information and belief, and that as to those matters, I believe them to be true. The source of my information are file records and phone conversations with plaintiff. The reason this verification is made by deponent and not by plaintiff is because plaintiff does not reside within the County where hers attorneys have an office.

Dated: New York, New York
      November 5, 2013

By: ___/s/ *Lawrence C. Glynn*_____
           Lawrence C. Glynn